[See Cases Nos. 17,593 and 17,594.]

## Case No. 17,593.

### WHITNEY v. MOWRY.

[4 Fish. Pat. Cas. 141.] [1]

Circuit Court, S. D. Ohio. Oct., 1868.

PATENTS—NOVELTY AND UTILITY—INFRINGEMENT —MEASURE OF PROFITS—CAR WHEELS.

1. The novelty, utility, and vitality of Whitney's patent, lies in the reheating of car-wheels, in combination with slow cooling them.

2. If the proof were that up to the point where the wheels were ready to be subjected to some annealing process, they were worthless— had no actual or market value—and could not have until subjected to the process covered by the plaintiff's patent, then perhaps the entire amount of profit made by the manufacture of the wheels would be the measure of damages.

3. Irrespective of that particular aspect, the case would seem to be one for the apportionment of damages.

4. If a party invent a machine having no salable commercial value, and then use in connection with it the invention of another, no matter how slight, which gives it its entire market value, it would seem, at first, that the amount to be recovered should be the entire amount of profit.

5. But if the thing made be of considerable magnitude and cost, and the invention applied to it be slight in cost and value, and yet so attracting to the public taste that no one will buy the original article without the addition of the new invention, it would seem to be a hard measure of justice in a court of equity to give the entire profit to the patentee of the small and trivial invention.

6. Case referred back to the master to report whether the wheels made and sold by the defendant had, or could have been made to have, any market value without being subjected to the process patented to the complainant, and if so, how much additional and greater market value, if any, they derived from being subjected to said patented process.

---

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

These were motions to confirm and reject the report of the master to whom had been referred the inquiry as to the profits derived by the defendant from the infringement of letters patent for "method of annealing and cooling cast-iron car-wheels." granted to Asa Whitney. April 5. 1848. and extended for seven years from April 5. 1862. The original case is reported in Whitney v. Mowry [Case No. 17,592]. The master reported profits from the manufacture of car-wheels made by the infringing process amounting to about ninety thousand dollars. He also reported that the defendant had manufactured car-wheels without annealing, prior to the adoption of the infringing process and after its discontinuance by reason of the injunction; that the unannealed wheels sold for the same price as the annealed. while the latter cost about twenty-five cents each more than the former. The complainant claimed the entire amount of profit as reported by the master, while the defendant insisted that no profits had been made by the use of the patented process.

Henry Baldwin, Jr., and S. S. Fisher. for complainant.

C. B. Collier and E. M. Stanton, for defendant.

SWAYNE. Circuit Justice. The only question before us, as the case has been presented in the argument just closed. is, whether by the master's report, as it stands, the plaintiff is entitled to the entire amount of profits which have been made by the defendants as estimated. If that be clear, we need no further light on the subject, and there is no necessity for referring the matter back to the master for a further report, and for him to take further testimony in the case, leading to the proper solution of this point.

The claim of the patent is as follows: "I do not claim to be the inventor of annealing castings made of iron, or other metal, when done in the ordinary way." That ordinary way is well understood in the history of the arts, and need not be remarked upon. "Nor do I claim to be the inventor of any particular form or kind of furnace in which to perform the process." There is here a clear implication and recognition of the right of others, notwithstanding the patent of the plaintiff. to perform this annealing process in the ordinary way, by means of a furnace used for that purpose. "But what I do claim as my invention, and desire to secure by letters patent. is the process of prolonging the time of cooling, in connection with annealing railroad wheels in the manner above described—that is to say, the taking them from the molds in which they are cast before they have become so much cooled as to produce such inherent strain on any part as to impair its ultimate strength, and immediately after being thus taken from the molds. depositing them in a previously heated furnace or chamber, so constructed. of such materials. and subject to such control, that the temperature of all parts of the wheels deposited therein, may be raised to the same point (say a little below that at which fusion commences) when they are allowed to cool so fast and no faster. than is necessary for every part of each wheel to cool and shrink simultaneously together, and no one part before another."

Here, it will be observed. in relation to this claim, that two things are claimed, and every thing else is disclaimed: (1) The reheating of the wheel to be annealed, and that reheating, in connection with the slow-cooling process, which slow-cooling process was known before in the history of the arts. The reheating is that which is claimed to be new, and which this court has found. heretofore, to be new; this combination of the reheating with the old thing—the slow-cooling of the wheel. Now pursuing this line of thought and analysis, we find that railroad wheels are to be made of the same dimensions as before; they are to be of the same configuration as before; they are to be made of fused metal as before; the metal is of the same kind as before; it is to be fused in the same manner as before, it is to be introduced into the proper molds in the same manner as before; the wheel is to be completed—aside from the annealing process—in the same manner as before, it is to be taken from the molds in the same manner as before. Up to this point the process of the patentee toward the accomplishment of the ultimate result, is just the same as would be pursued if the plaintiff's process had never been invented. Here the roads fork, and the divergence commences. Now any person, irrespective of this patent, after the wheel has reached the point mentioned. would have the right, in consistency with this patent, immediately to put it into a pit—the right would exist. as I understand is conceded. to apply hot sand, sand previously heated—the right would exist to close the pit. and exclude the air. and to subject the metal to the annealing process by slow cooling, as the phrase is. to such extent as this means or any other means known in the history and practice in the art of annealing prior to that time, might suggest. The plaintiff then availing himself of all these means and instrumentalities. interposes, in the progress of the construction and completion of the wheel, a new element, the right to use which exclusively is secured to him; and that new element is simply, after the wheel has been taken from the mold. and has been placed in the pit, to subject it to a reheating—a tempering which involves the reheating of the iron structure; and then that reheating is to be connected with the old process of slow cooling. In this reheating. in combination with slow cooling, lies the novelty. the utility. the vitality of this patent.

Viewing this subject in this light, it does not seem to us that there is any thing in the case—any fact or feature which should take it up from the rule laid down by the supreme court —and which stands unshaken. in the case of

Seymour v. McCormick, 16 How. [57 U. S.] 480.

Now I have referred to this extent upon the case as presented, irrespective of one element, to which I am now about to address myself, and in reference to which, I submitted to counsel who argued this question one or two inquiries, the answers to which then seemed to me, and still seem to me, to be very material, and which I understand are not answered by the report of the master.

There is proof in the case that car-wheels, annealed in modes known in the history and application of the art, otherwise than by the mode involved in the invention of the plaintiff, have a market value—that they have been sold and used—that they are still sold and used. But upon this subject the proof is not clear or full, nor by any means conclusive. Nor has the master categorically reported upon this particular point. All this is preliminary, as it regards this view of the subject, and this proposition. If the proof were, that when the wheels were made up to that point—when they are to be subjected to some annealing process —if the proof were that the wheel, at that point, was worthless—had no actual or market value—was worth nothing to the maker, and could not be of any value to him until subjected to the process covered by the plaintiff's patent, then, perhaps, and I use that word upon reflection, then, perhaps, it might be said that if the wheel had no value before being annealed according to the process of the plaintiff, and after being so annealed, its value involved a particular amount of profit, more or less; perhaps it might be said the entire amount of profit made by the manufacture of the wheel was due to the process of the plaintiff, and that, therefore, would be the standard and measure for the recovery of damages.

Now the master, as I understand, has not presented the case in this aspect. Irrespective of this particular aspect, we have no hesitation in saying that this is a case proper for the apportionment of damages. But it seems to us that it might as well be claimed that the plaintiff was entitled to the entire profit of the running gear, other than the wheel, or upon the entire car, involving the running gear as well as the body of the car, as the entire profit made upon this wheel. The master has not reported on this subject; and here it seems there is clearly wanting an element to enable us to arrive at a proper conclusion on this particular point; and as it may possibly come before us hereafter, on the report of the master, I wish here to make one or two additional suggestions. So far as I know, this question is a new one, and I have as yet been unable to come to any conclusion on the subject entirely satisfactory to my own mind. But it would seem to be very clear that if a party invent a machine, or any thing else that is perfectly valueless, having no salable commercial value, and which in every other respect is worthless because he can not sell it; and then use in connection with that machine or structure, or article, whatever it may be, the invention of another, no matter how slight that invention may be, which gives it its entire market value, it would seem at first view that the amount to be recovered should be the entire amount of profit, because there is a proximate, inseparable connection between the old, or useless article sold by means of the new invention, which could not have been sold otherwise. In the case of a close monopoly, there is a profit made which it would seem, at first view, is entirely due to the infringement of the patent right of another; and it would seem that the infringer ought not to be permitted to say, under such circumstances, that there should be an apportionment of the profits. But, on the other hand, take the case for instance of a railroad car, or any thing else, the making of which involves a large expenditure of money; and then by the application of the invention of another, slight and trifling in its character— of very little cost—of no value, except in connection with that structure, the application of that slight improvement is sufficient to turn the scale in the market, so that nobody will buy the article except in connection with the patented invention. Suppose, in further illustration of this view of the subject, it be a railroad car, the cost of which is thousands of dollars, and some little invention is made in regard to the interior structure of the car, or in its ornamentation, which is patentable under the act of 1861; yet the slight, the simple thing is such as to strike the public taste and judgment, and have such an effect in the commercial world that nobody will buy the article without that invention; yet it would seem to be a pretty hard measure of justice in a court of equity, to say that the entire profits made on that large article should go into the pockets of the inventor and patentee of this small thing, which had been used without license or authority in connection with it.

I therefore have to remark, as it regards this particular question, we intend to leave the case open. The case must go back to the master, for a fuller report upon the general subject, which was adverted to this morning, and discussed this afternoon, in connection with damages, and to which the court has adverted just now. The question must go to the master to take testimony, and report what portion of the profits made by the defendant are due to the use of the invention of the plaintiff by him, without authority; and it may be said further, that this general inquiry would involve a further element relating to the subject. The inquiry may be more specific, to the extent of requiring the master to take testimony, and report whether the wheels were not worth something, without the use of this invention, whether they could have been sold at all. If he finds they could not, then the question to which I have adverted will come before the court for consideration. If he finds there is a sale for wheels not covered by this patent; if he finds the wheels could have been made marketable and salable, though not so

salable as if the process of the plaintiff had been used, then he will have to inquire what portion of the profits which the defendant realized is due to the use of the process covered by the plaintiff's patent. With the case before us in this single aspect, we shall then be prepared to dispose of this question; until then, we feel that the question is not ready for us; we shall terminate the argument, and refer the case back to the master, in conformity with the directions just submitted.

In the administration of justice in this class of cases, I have found it a saving of time and expense, beside giving specific instructions to the master, to direct that he take testimony and report upon any other subject according to the direction of counsel in the case on either side. As my associate on the bench, who heard the case originally, suggests, we do not mean to throw the rein loose on the neck of the master, and let him go where he chooses. We do not want him to go over ground on which he has already gone. The testimony to be sought is additional to the testimony already taken, and on a point not already reported upon.